1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

AHKIN RAYMOND MILLS,

    Petitioner,

v.

GARY SWARTHOUT,

    Respondent.

Case No. 14-CV-00255-LHK

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Re: Dkt. No. 1

On May 12, 2009, Petitioner Ahkin Mills was convicted of first degree murder with personal use of a firearm. ECF No. 12-5 at 106. On May 20, 2009, the jury found Mills legally sane at the time he committed the offense. *Id.* at 150. On August 12, 2009, the California Superior Court sentenced Mills to 50 years to life in prison. *Id.* at 161.

On February 28, 2011, the California Court of Appeal affirmed the judgment against Mills in an unpublished decision. *People v. Mills*, 2011 WL 683408, at *13 (Cal. Ct. App. Feb. 28, 2011) ("*CoA Decision*"). On October 18, 2012, after granting review, the California Supreme Court unanimously affirmed the judgment in a published opinion. *People v. Mills*, 286 P.3d 754 (Cal. 2012).

Before the Court is Mills's Petition for Writ of Habeas Corpus. ECF No. 1 ("Pet.").

Having considered the parties' briefing, the relevant law, and the record in this case, the Court DENIES Petitioner's Petition for Writ of Habeas Corpus.

## I. BACKGROUND

Federal courts reviewing habeas petitions are instructed to presume that the factual determinations of state courts are correct unless that presumption is rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Accordingly, the factual background provided by the California Supreme Court will serve as the factual framework for this habeas review.[1] It is provided below:

> Shortly before 5:00 on the afternoon of April 21, 2005, Jason Jackson-Andrade entered the Amtrak station in Emeryville. Eyewitness testimony established the ensuing events. As Jackson-Andrade sat on a bench on the platform, defendant approached him and launched a tirade of insults. He told Jackson-Andrade, "You ain't getting on that train." Jackson-Andrade went into the station, sat down, and asked a woman if she knew the man outside. She said she did not. Jackson-Andrade told her he had not done anything, but the man was "cussing" at him and acting as though he wanted to kill him.

> Defendant walked around on the platform for several minutes, bouncing on his toes, humming, and talking to himself. He then began walking toward the station in a determined manner, saying, "You got a gun, nigger? You got a gun? You got a gun?" He entered the station, approached Jackson-Andrade, and twice said, "Motherfucker, you want to kill me?" He also asked, "You got a gun?" As Jackson-Andrade looked up at him, defendant said, "Well, if you ain't got no motherfucking gun, I do," and produced a revolver from his pocket. Defendant shot Jackson-Andrade, who held up his hands and said, "Please, don't shoot me again, don't shoot." Jackson-Andrade fell from his seat and began crawling away. Defendant shot him five more times in the back and once in the back of the thigh.

> When the police arrived, defendant lay on the ground, sliding his gun forward and assuming a prone position. He told them he was the only shooter. Jackson–Andrade died at the scene.

> Defendant testified in his own defense. He claimed that because of death threats from various individuals, he and his wife had left their home in Merced to live with his cousin Telitha in Rodeo. He had been visiting another cousin in Sacramento in the days before the murder. As he walked around Sacramento, he began to suspect that he was being followed. On the morning of the murder, he stole a car at gunpoint and drove from Sacramento to Rodeo. He had Telitha take

---

[1] The Court includes more detail on the trial proceedings as necessary in the Analysis section, below.

him to the Amtrak station because he did not want the people following him to find her or his wife. As he approached the station, he heard someone say, "You're going to feel it today," which he took to mean that he was going to be shot.

On the platform, defendant became suspicious of two men, one of whom looked at him and said into his cell phone, "He looks scared." Defendant claimed that after these men left, Jackson-Andrade beckoned to him. As defendant approached, Jackson-Andrade became angry and threatened to kill him. Jackson-Andrade then got up and went into the station, pausing at the door to make a hand gesture indicating that he had a gun. Defendant was nervous, and had to go to the bathroom, so he entered the station. When he saw Jackson-Andrade sitting inside talking to a lady, defendant "jumped" and the contents of his backpack spilled onto the floor. Jackson-Andrade got up and put his hand into his pocket. Defendant thought he was reaching for a gun, so he shot him. As Jackson-Andrade lay on the ground, defendant again thought he was reaching for a weapon, so defendant shot him again. Defendant testified that he shot only twice, but on cross-examination admitted he had reloaded his gun and continued firing.

Defendant's wife and cousin testified that he told them people were after him. His wife said he thought radio commercials were speaking to him, that the FBI was in a FedEx truck, and that cars were following him. A psychologist testified for the defense. After interviewing defendant, reviewing the police reports and witness statements, and giving defendant several psychological tests, he concluded that in April 2005 defendant suffered from a delusional disorder in the paranoid spectrum. The expert carefully focused his testimony. In his opinion, defendant did not suffer from a severe mental illness like schizophrenia or bipolar disease, nor were his delusions utterly beyond the realm of possibility. They concerned events that might actually happen, but defendant's belief in them was a function of his paranoid personality style. He tended to be hypervigilant, interpreting events in a personalized and threatening way. Stress exacerbated his symptoms.

The theory of the defense was good faith but unreasonable self-defense, also known as "imperfect" self-defense. (*See People v. Blakeley* (2000) 23 Cal. 4th 82, 87–88; *In re Christian S.* (1994) 7 Cal. 4th 768, 773.) Defense counsel urged the jury to find defendant guilty only of manslaughter, because he actually but unreasonably believed the victim posed an imminent threat when he shot him. However, counsel also argued that defendant's fear was not purely delusional. Noting the jury would be instructed that the fear giving rise to unreasonable self-defense may not derive from delusion alone, counsel contended defendant's fears were based on actual facts and experiences that he misinterpreted due to his paranoia.

The prosecutor requested a special instruction based on section 1026: "For purposes of reaching your verdict during this guilt phase of the proceedings, the defendant is conclusively presumed to have been sane at the time of the offense."[2]

---

[2] The instruction that the trial court actually gave said, "For purposes of reaching a verdict in the

Case No. 14-CV-00255-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Defendant filed a written objection, arguing that "giving this instruction would violate Defendant's rights to due process and a fair trial because it might tend to confuse the jury and would have the effect of lower[ing] the prosecution's burden of proving intent . . . . Specifically, the Defense submits this instruction might be misinterpreted by the jury as directing them to disregard Defendant's evidence regarding mental illness, and that the jury may misinterpret this instruction as directing them to presume a mental condition which has not been adequately defined or distinguished from Defendant's evidence regarding mental illness." If the instruction were to be given, defendant asked the court to instruct the jury on the legal definition of insanity, and advise it that "The presumption of sanity does not mean you are to disregard evidence of mental illness. You may consider such evidence as directed by other instructions I have given you."

The court gave the special instruction on the presumption of sanity, immediately following an instruction on unreasonable self-defense. It refused to give defendant's proposed additional language, stating: "I don't want to get into what the definition of sanity is in this phase of the proceedings and I don't think that you can be wrong by correctly stating the law."

*Mills*, 286 P.3d at 756-57.

On appeal before the California Court of Appeal, Mills raised a number of issues under state and federal law, which included an argument that Mills's right to due process had been violated by the presumption-of-sanity instruction given to the jury. Specifically, Mills argued that the presumption-of-sanity instruction lowered the prosecution's burden of proving guilt beyond a reasonable doubt because Mills had asserted imperfect self-defense based in part on mental illness. *CoA Decision*, 2011 WL 683408 at *9. On February 28, 2011, the California Court of Appeal rejected Mills's argument and held that no due process violation had occurred. *See id.* at *13.

The California Supreme Court granted review solely as to the presumption-of-sanity issue, and on October 18, 2012, unanimously affirmed Mills's conviction in a published decision. *Mills*, 286 P.3d at 766. The California Supreme Court held that the trial court erred by giving the presumption-of-sanity instruction during the guilt phase of the trial, but Mills's due process rights were not violated by the instruction. It explained:

Here, given the other accurate jury instructions regarding mental illness and unreasonable self-defense, and both counsel's arguments on the merits of those issues, there is no reasonable likelihood that the jury would have applied the

guilt phase of this trial, you are to conclusively presume that the defendant was legally sane at the time the offense is alleged to have occurred." *See* ECF 12-5 at 95; ECF 12-11 at 221.

Case No. 14-CV-00255-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

> presumption of sanity to reduce the prosecution's burden of proof. Like the
> *Middleton* [*v. McNeil*, 541 U.S. 433 (2004)] court, we do not presume the jury
> blindly followed an instruction that was inconsistent with other correct
> instructions and the arguments of counsel. Rather, we view the record as a whole,
> and consider the instructions in context. This jury, which had been informed that
> a sanity phase would follow if defendant were found guilty, was likely to
> conclude that the presumption operated to preserve the issue of sanity for the
> appropriate phase.

*Id.* at 765.

In addition, the California Supreme Court noted that under California law, "[a] person may be entirely free of any mental disease . . . but actually, although unreasonably, believe in the need for self-defense." *Id.* at 763 (quoting *In re Christian S.*, 7 Cal. 4th at 778). Thus, the California Supreme Court held that the jury could have presumed that Defendant was free of any mental disease and still found that Defendant held an unreasonable belief in the need for self-defense. *Id.* at 763-64.

On January 16, 2014, Mills filed the instant Petition for Writ of Habeas Corpus. *See* Pet. The case was assigned to Magistrate Judge Joseph Spero. ECF No. 4. On March 28, 2017, Judge Spero issued an Order to Show Cause Why Writ of Habeas Corpus Should Not Issue. ECF No. 7. On April 10, 2017, Respondent declined magistrate judge jurisdiction. ECF No. 8. On April 12, 2017, the instant case was reassigned to the undersigned judge. ECF No. 10.

On June 29, 2017, Respondent filed a response to Mills's Petition. ECF No. 12. On July 26, 2017, Mills filed a traverse. ECF No. 13.

## II.     LEGAL STANDARD

### A.     Antiterrorism and Effective Death Penalty Act (28 U.S.C. § 2254(d))

Because Mills filed his original federal habeas petition in 2011, the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to the instant action. *See Woodford v. Garceau*, 538 U.S. 202, 210 (2003). Pursuant to AEDPA, a federal court may grant habeas relief on a claim adjudicated on the merits in state court only if the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted

in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

### 1. Contrary To or Unreasonable Application of Clearly Established Federal Law

As to 28 U.S.C. § 2254(d)(1), the "contrary to" and "unreasonable application" prongs have separate and distinct meanings. *Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court."). A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 412-13.

A state court's decision is an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A]n unreasonable application of federal law is different from an incorrect application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). A state court's determination that a claim lacks merit is not unreasonable "so long as 'fairminded jurists could disagree' on [its] correctness." *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Holdings of the United States Supreme Court at the time of the state court decision are the sole determinant of clearly established federal law. *Williams*, 529 U.S. at 412. Although a district court may "look to circuit precedent to ascertain whether [the circuit] has already held that the particular point in issue is clearly established by Supreme Court precedent," *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (per curium), "[c]ircuit precedent cannot refine or sharpen a general principle of [United States] Supreme Court jurisprudence into a specific legal rule," *Lopez v. Smith*, 135 S. Ct. 1, 4, (2014) (per curium) (internal quotation marks omitted).

### 2. Unreasonable Determination of the Facts

In order to find that a state court's decision was based on "an unreasonable determination

of the facts," 28 U.S.C. § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record before the state court," *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) (internal quotation marks omitted). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013). That said, "where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

In examining whether a petitioner is entitled to relief under 28 U.S.C. § 2254(d)(1) or § 2254(d)(2), a federal court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). In the event that a federal court "determine[s], considering only the evidence before the state court, that the adjudication of a claim on the merits resulted in a decision contrary to or involving an unreasonable application of clearly established federal law, or that the state court's decision was based on an unreasonable determination of the facts," the federal court evaluates the petitioner's claim de novo. *Hurles*, 752 F.3d at 778. If error is found, habeas relief is warranted if that error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). Petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)).

## III.   DISCUSSION

Mills raises a single issue in his petition: whether the jury instruction that required the jury to conclusively presume that Mills was legally sane during the guilt phase of his trial violated the

Due Process Clause of the Fourteenth Amendment.[3]  First, the Court sets forth U.S. Supreme Court precedent on constitutional errors in jury instructions—particularly jury instructions that contain presumptions alleged to violate the Due Process Clause.  Second, the Court discusses the presumption of sanity and relevant Ninth Circuit precedent.  Finally, the Court discusses whether the California Supreme Court's decision in this case was contrary to or an unreasonable application of clearly established federal law.

**A.     U.S. Supreme Court Precedent on Challenges to Jury Instructions**

The Due Process Clause of the Fourteenth Amendment protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he or she is charged.  *In re Winship*, 397 U.S. 358, 364 (1970).  A jury charge containing a "presumption[] violate[s] the Due Process Clause if [the jury charge] relieve[s] the State of the burden of persuasion on an element of an offense."  *Francis v. Franklin*, 471 U.S. 307, 314 (1985).  The landmark United States Supreme Court decisions on the constitutionality of burden-shifting presumptions in jury instructions are *Sandstrom v. Montana*, 442 U.S. 510 (1979), and *Francis v. Franklin*, 471 U.S. 307 (1985).  In *Sandstrom*, the U.S. Supreme Court considered an instruction reading, "the law presumes that a person intends the ordinary consequences of his voluntary acts."  The U.S. Supreme Court held that when given in a case in which intent is an element, the instruction is unconstitutional because it has "the effect of relieving the State of the burden of proof . . . on the critical question of [the defendant's] state of mind."  *See Sandstrom*, 442 U.S. at 512, 521-24.  In *Francis*, the U.S. Supreme Court, relying on *Sandstrom*, considered instructions reading, "[t]he acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted" and "[a] person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts."  *See Francis*, 471 U.S. at 309.  The U.S. Supreme Court held that because intent was an element of the charged offense, such instructions were unconstitutional "[b]ecause a reasonable jury could have

---

[3] Mills's Petition mentions the Sixth Amendment several times in passing but does not make any substantive arguments based on the Sixth Amendment.  *See* Pet. at 4, 29, 31, 34, 45.

8

1  understood the challenged portions of the jury instruction . . . as creating a mandatory presumption

2  that shifted to the defendant the burden of persuasion on the crucial element of intent." *See id.* at

3  325.

4  However, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to

5  the level of a due process violation. The question is 'whether the ailing instruction . . . so infected

6  the entire trial that the resulting conviction violates due process.'" *Middleton v. McNeil*, 541 U.S.

7  433, 437 (2004) (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)). "[A] single instruction to a

8  jury may not be judged in artificial isolation, but must be viewed in the context of the overall

9  charge." *Boyde v. California*, 494 U.S. 370, 378 (1990) (quoting *Cupp v. Naughten*, 414 U.S. 141,

10  146-147 (1973)). If the charge as a whole is ambiguous, the question is whether there is a

11  "'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates

12  the Constitution.'" *Estelle*, 502 U.S. at 72 (quoting *Boyde*, 494 U.S. at 380). Notably, this

13  standard, which turns on the likelihood of a jury's application of an instruction in an

14  unconstitutional way, differs from the standard applied in *Sandstrom* and *Francis*, which asked

15  how a reasonable juror could have understood the instruction's meaning. *Compare Estelle*, 502

16  U.S. at 72, *and Boyde*, 494 U.S. at 380, *with Francis*, 471 U.S. at 325, *and Sandstrom*, 442 U.S. at

17  514-15; *see Boyde*, 494 U.S. at 380 ("This 'reasonable likelihood' standard, we think, better

18  accommodates the concerns of finality and accuracy than does a standard which makes the inquiry

19  dependent on how a single hypothetical 'reasonable' juror could or might have interpreted the

20  instruction."); *see also Saffle v. Parks*, 494 U.S. 484, 508 & n.9 (1990) (Brennan, J., dissenting)

21  (recognizing change in standard). A determination that there is a reasonable likelihood that the

22  jury has applied the challenged instruction in a way that violates the Constitution establishes only

23  that an error has occurred. *See Calderon v. Coleman*, 525 U.S. 141, 146 (1998). If an error is

24  found, the court also must determine that the error had a substantial and injurious effect or

25  influence in determining the jury's verdict, *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993),

26  before granting relief in habeas proceedings. *See Calderon*, 525 U.S. at 146-47.

27  The U.S. Supreme Court applied *Estelle* and *Boyde* to a defective imperfect self-defense

28

9

instruction in *Middleton*, 541 U.S. 433. This Court recounts *Middleton* in some detail because of its relevance to the instant case. In *Middleton*, the trial court gave two correct jury instructions on imperfect self-defense, as well as the following two instructions:

> A person, who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully, but is not guilty of murder. This would be so even though a reasonable person in the same situation, seeing and knowing the same facts, would not have had the same belief. Such an actual but unreasonable belief is not a defense to the crime of voluntary manslaughter.

> An "imminent" peril is one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer as a reasonable person.

*Id.* at 435 (internal quotation marks omitted). "The last four words of this [last] instruction—'as a reasonable person'—are not part of the relevant form instruction, and were apparently included in error. The prosecutor's closing argument, however, correctly stated the law." *Id.* (internal citation omitted). The defendant in *Middleton* was convicted of second-degree murder. *Id.*

The California Court of Appeal in *Middleton* acknowledged the error in the jury instruction on imperfect self-defense but upheld the conviction. *Id.* The California Court of Appeal reasoned that it was "not reasonably likely that the jury would have misunderstood the requirements of the imperfect self-defense component of voluntary manslaughter" in light of the instructions as a whole and the prosecutor's correct statement of law in closing argument. *Id.* at 435-36. The U.S. District Court denied a petition for habeas corpus. *Id.* at 436. The Ninth Circuit reversed after concluding that the state court unreasonably applied federal law by "completely ignor[ing] unchallenged and uncorrected instructions to the jury," which "eliminated" the imperfect self-defense claim. *Id.* at 437 (quoting *McNeil v. Middleton*, 344 F.3d 988, 999 (9th Cir. 2003)).

The U.S. Supreme Court reversed. Specifically, the U.S. Supreme Court held that "[g]iven three correct instructions and one contrary one, the state court did not unreasonably apply federal law when it found that there was no reasonable likelihood the jury was misled." *Id.* at 438. The U.S. Supreme Court also observed that "[n]othing in *Boyde* precludes a state court from assuming

that counsel's arguments clarified an ambiguous jury charge. This assumption is particularly apt when it is the *prosecutor's* argument that resolves an ambiguity in favor of the *defendant*." *Id.*

**B.    California's Presumption of Sanity and Decisions of the Ninth Circuit and California Supreme Court**

**1.    California's Bifurcated Trials and Presumption of Sanity**

A California defendant is permitted by California Penal Code § 1026 to plead both "not guilty" and in the alternative "not guilty by reason of insanity." Insanity is not an element of any crime, but rather "is a plea raising an affirmative defense to a criminal charge," separate and independent from the elements of any underlying crime. *People v. Hernandez*, 994 P.2d 354, 359 (Cal. 2000) (emphasis omitted). Defendants who enter both pleas have two chances to avoid criminal punishment. *See People v. Elmore*, 325 P.3d 951, 966 (Cal. 2014). In bifurcated proceedings, the jury first determines whether the defendant is guilty. *See Knowles v. Mirzayance*, 556 U.S. 111, 114 (2009). "In the first phase, the defendant's guilt is determined without reference to his plea of insanity." *Patterson v. Gomez*, 223 F.3d 959, 964 (9th Cir. 2000) (footnote omitted). In fact, as a matter of California law, the defendant is presumed to be legally sane during the guilt phase of the trial. Cal. Penal Code § 1026(a); *Elmore*, 325 P.3d at 963. "[E]vidence of mental disease, defect or disorder is not admissible to show diminished capacity per se, but it is admissible to show whether a particular defendant actually had the mens rea required for a specific intent crime[.]" *Patterson*, 223 F.3d at 965 n.4 (citing Cal. Penal Code § 28(a)).

If the jury finds the defendant guilty, the jury then determines whether the defendant was legally sane at the time of the crime. *See Knowles*, 556 U.S. at 114; *Patterson*, 223 F.3d at 964; *Elmore*, 325 P.3d at 966. At the sanity phase of the trial, "the defendant bears the burden of proof by a preponderance of the evidence, and may be found not guilty by reason of insanity." *Elmore*, 325 P.3d at 966.

**2.    Ninth Circuit's Decisions in *Patterson v. Gomez* and *Stark v. Hickman***

The Ninth Circuit has addressed whether an instruction on the presumption of sanity at the

United States District Court
Northern District of California

guilt phase is an unreasonable application of U.S. Supreme Court precedent, namely, *Sandstrom* and *Francis*. In *Patterson v. Gomez*, 223 F.3d 959 (9th Cir. 2000), *cert. denied sub nom. Terhune v. Patterson*, 531 U.S. 1104 (2001), the Ninth Circuit addressed a habeas petition following a murder conviction at a trial bifurcated into a guilt phase and a sanity phase. At the guilt phase, the defendant argued that he lacked the requisite mental state for first degree murder because of his mental illness. The trial court in *Patterson* gave the following instruction to the jury:

> Evidence has been received regarding a mental disease or mental disorder of the defendant at the time of the crime in the Information. You may consider such evidence solely for the purpose of determining whether or not the defendant actually formed the mental state which is an element of the crime charged in the Information, and are [sic] found in the definitions of murder.

> If from all the evidence you determine to be credible you have a reasonable doubt whether the defendant formed any required mental state or had the necessary specific intent, you must find that he did not have such mental state or specific intent.

> At the time of the alleged offense charged in the Information, you were [sic] instructed to presume that the defendant was sane.

*Id.* at 964. The Ninth Circuit held that even though the first paragraph of the above instruction informed the jury that "mental disease or mental disorder" could be considered "for the purpose of determining whether or not the defendant actually formed the mental state which is an element of the crime charged," the third paragraph of the above instruction violated due process. Specifically, the Ninth Circuit held that "[t]he problem with the instruction given in this case is that it tells the jury to presume a mental condition that—depending on its definition—is crucial to the state's proof beyond a reasonable doubt of an essential element of the crime." *Id.* at 965.

The Ninth Circuit relied on dictionary definitions of "sane," which included "proceeding from a sound mind," "rational," "mentally sound," and "able to anticipate and appraise the effect of one's actions." *Id.* Because the trial court did not instruct the jury on California's definition of legal sanity under *M'Naghten* or the reason for bifurcating the trial into a guilt phase and a sanity phase, the Ninth Circuit noted that the jury could have applied the broader, dictionary definition of insane, which possibly could encompass a broader swath of mental diseases or disorders. *Id.* ("But if a jury is instructed that a defendant must be presumed 'sane'—that is, 'rational' and

‘mentally sound,' and 'able to anticipate and appraise the effect of [his] actions,'—a reasonable juror could well conclude that he or she must presume that the defendant had no such mental disease, defect, or disorder.").

As a result, the Ninth Circuit in *Patterson* held that "[i]f the jury is required to presume the non-existence of the very mental disease, defect, or disorder that prevented the defendant from forming the required mental state for first degree murder, that presumption impermissibly shifts the burden of proof for a crucial element of the case from the state to the defendant." *Id.* at 965. Thus, the Ninth Circuit held that the presumption of sanity instruction violated the due process clause in a manner that was an unreasonable application of U.S. Supreme Court precedent.

In *Stark v. Hickman*, 455 F.3d 1070 (9th Cir. 2006), the Ninth Circuit, in a substantially similar case involving a murder conviction and a trial bifurcated under § 1026 into a guilt phase and a sanity phase, reaffirmed *Patterson*'s holding. *Id.* at 1075-78. As in *Patterson*, the defendant had argued that his mental illness prevented him from forming the intent to commit murder, and the trial court instructed the jury that "[i]n the guilt phase of a criminal action the defendant is conclusively presumed to be sane." *Id.* ("In this case, the presumption of sanity instruction given to the jury was, in all material respects, equivalent to the instruction at issue in *Patterson*."). The trial court did not instruct the jury on the *M'Naghten* test or the reason behind the bifurcated trial. *Id.* at 1078. The California Court of Appeal in *Stark* held that the jury was unlikely to have been confused by the presumption-of-sanity instruction, given the other jury instructions and the vigorous debate on mental state during closing arguments. *Id.* at 1075.

The Ninth Circuit nevertheless held that *Patterson* controlled and that the instruction violated the defendant's right to due process because "a reasonable juror could have concluded that he or she must presume that petitioner had no mental disease, defect, or disorder," which thus required a presumption of "a crucial element of the state's proof that [petitioner] was guilty of [the requisite intent]." *Id.* at 1078 (citation omitted). Moreover, the error was not harmless because, even though the prosecutor and defense counsel vigorously debated the mental state issue during closing arguments, "[that] lively debate took place under the wrong ground rules. The jury

13

weighed these arguments using the judge's charge, and that charge bluntly told them that petitioner was conclusively sane, eliminating the requirement that the state prove petitioner's mental state." *Id.* at 1080.

### 3. California Supreme Court's Decision in the Instant Case

The California Supreme Court's unanimous decision in 2012 in the instant case held that Mills's due process rights were not violated by the instruction requiring the jury to conclusively presume that Mills was legally sane at the guilt phase of the trial.[4] The California Supreme Court held that giving the instruction violated state law because "the presumption of sanity had no bearing on any issue before the jury at the guilt phase of defendant's trial." *Mills*, 286 P.3d at 762. However, the California Supreme Court held,

> [G]iven the other accurate jury instructions regarding mental illness and unreasonable self-defense, and both counsel's arguments on the merits of those issues, there is no reasonable likelihood that the jury would have applied the presumption of sanity to reduce the prosecution's burden of proof. Like the *Middleton* court, we do not presume the jury blindly followed an instruction that was inconsistent with other correct instructions and the arguments of counsel. Rather, we view the record as a whole, and consider the instructions in context. This jury, which had been informed that a sanity phase would follow if defendant were found guilty, was likely to conclude that the presumption operated to preserve the issue of sanity for the appropriate phase.

*Id.* at 765.

First, the California Supreme Court distinguished *Patterson* and *Stark*. The California Supreme Court noted that unlike the defendants in *Patterson* and *Stark*, Mills did not claim "a general absence of the requisite mental state." *Id.* at 763. Instead, Mills "admitted that he intentionally shot the victim, and did not dispute the intent to kill. His argument was that he unreasonably believed in the need to defend himself, and therefore acted without malice and was guilty only of manslaughter." *Id.* The California Supreme Court noted that under California law, "[a] person may be entirely free of any mental disease . . . but actually, although unreasonably, believe in the need for self-defense." *Id.* (quoting *In re Christian S.*, 7 Cal. 4th at 778). Thus, the

---

[4] Justice Corrigan authored the opinion, and Chief Justice Cantil-Sakauye and Justices Kennard, Baxter, Werdegar, Chin, and Liu concurred. *Mills*, 286 P.3d at 682.

Case No. 14-CV-00255-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

California Supreme Court held that the jury could have presumed that Defendant was free of any mental disease and still found that Defendant held an unreasonable belief in the need for self-defense. *Id.*

Second, the California Supreme Court noted that under California law, a "defendant could not claim unreasonable self-defense based entirely on delusion." *Id.* (citing *People v. Mejia–Lenares*, 38 Cal. Rptr. 3d 404, 416-21 (Ct. App. 2006)). Indeed, in the instant case, the jury was instructed that "[t]he defense of imperfect self-defense is not available to a defendant whose belief in the need to use self-defense is based on delusion alone." *Id.* at 763 & n.10. The California Supreme Court then noted that Mills's expert had asserted that "[Mills's] paranoia was not entirely delusional." *Id.* at 763. Thus, the California Supreme Court found that a presumption of sanity did not preclude a finding that Mills acted in unreasonable self-defense.

Third, the California Supreme Court addressed Mills's argument that even though the jury was not precluded from finding that Mills acted in unreasonable self-defense with a presumption of sanity, the instruction prevented the jury from finding that "mental illness *contributed* to his unreasonable belief in the need to defend himself." *Id.* To evaluate this issue, the California Supreme Court looked to whether "the conclusive presumption of sanity was reasonably likely to have reduced the prosecution's burden of proof" by "view[ing] the instructions as a whole and consider[ing] the effect of the challenged instruction in the context of the entire trial." *Id.* (citing *Middleton*, 541 U.S. at 437).

The California Supreme Court held that the following aspects of the trial showed that the presumption-of-sanity instruction did not reduce the prosecution's burden of proof. First, the jury instructions contained instructions about defendant's mental state, the role of hallucination in the determination, and the fact that unreasonable self-defense could not be based on delusion alone. The California Supreme Court held that these instructions "would [not] have made sense if the jury understood that defendant was conclusively presumed to be free of mental disease or disorder" and that "the jury would not have tended to believe that the presumption of sanity barred it from considering the evidence of defendant's mental illness." *Id.*

In addition, the California Supreme Court noted that "[d]efense counsel strongly urged the jury to consider the mental health evidence in determining whether defendant had acted in unreasonable self-defense." *Id.* at 764. Moreover, the prosecutor mentioned the presumption of sanity "only as a preliminary consideration, relating it to the bifurcated stages of trial" and did not use the presumption to "attack defendant's evidence of his mental condition." *Id.* "Rather, she challenged the reliability of the defense psychologist's testimony, and argued that defendant had fabricated his claim of unreasonable self-defense." *Id.* The California Supreme Court explained that the prosecutor "placed great weight on the testimony of the eyewitnesses and the physical evidence, contending that defendant's version of the events was inconsistent with what others saw, with the spent shells recovered at the scene, with the wounds suffered by the victim, and with defendant's conduct after the police arrived." *Id.* As a result, the California Supreme Court held that it was "highly unlikely that the jury would base its decision on the presumption of sanity instead of the evidence and the proper instructions." *Id.*

**C.  Analysis**

In the instant petition, Mills argues that the presumption-of-sanity instruction given to the jury impermissibly shifted the prosecutor's burden of proof and thus violated Mills's right to due process. He also argues that the California Supreme Court applied the wrong standard in analyzing his jury instruction challenge. First, the Court concludes that the California Supreme Court's decision applied the correct standard to his claim and was not contrary to clearly established federal law. Second, even assuming that the presumption-of-sanity instruction would impermissibly shift the burden of proof if given effect by the jury, the Court concludes that the California Supreme Court's decision did not unreasonably apply clearly established federal law when it held that there was no reasonable likelihood that the jury applied the instruction in an unconstitutional manner. The Ninth Circuit's decisions in *Patterson* and *Stark* do not compel a different result.

**1.  The California Supreme Court's Decision Was Not Contrary to Federal Law**

Mills argues that the California Supreme Court erred by applying *Middleton* and looking to

Case No. 14-CV-00255-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

the trial court's other jury instructions to weigh the likely effect of the presumption-of-sanity instruction on the jury's verdict.  Pet. at 43-44.  Mills appears to argue that because *Middleton* did not address jury instructions that included presumptions, its "reasonable likelihood" standard (and, by extension, that of *Estelle* and *Boyde*) does not apply to the instant case.  *Id.*  Rather, Mills contends that *Francis* supplies the correct standard: "what a reasonable juror could have understood the conclusive presumption of sanity charge as meaning."  *Id.* at 43.  In addition, Mills contends that other jury instructions "are insufficient to cure a constitutionally infirm instruction."  *Id.* at 44 (citing *Francis*, 471 U.S. at 319, 322).  The Court construes Mills as arguing that the California Supreme Court's decision was contrary to clearly established federal law because it allegedly applied the wrong legal standard.  However, U.S. Supreme Court precedent clearly contradicts Mills's position, and so Mills's "contrary to" argument under 28 U.S.C. 2254(d)(1) fails.

As the Court explained above, the U.S. Supreme Court in *Boyde* clarified the standard that applies to challenges to jury instructions where the charge is ambiguous.  *Boyde*, 494 U.S. at 380.  After considering various formulations that it had used in previous cases, the U.S. Supreme Court stated, "We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  *Id.*  The U.S. Supreme Court went on, "Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning . . . .  Differences among them in interpretation may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting."  *Id.* at 380-81.  In *Estelle*, the U.S. Supreme Court reiterated that *Boyde* displaced previous formulations that focused on how a reasonable juror might interpret an instruction.  *See* 502 U.S. at 72 n.4.  It explained:

> In *Boyde*, . . . we made it a point to settle on a single standard of review for jury instructions—the 'reasonable likelihood' standard—after considering the many different phrasings that had previously been used by this Court.  494 U.S. at 379-80 (considering and rejecting standards that required examination of either what a reasonable juror 'could' have done or 'would' have done).  So that we may once

17

again speak with one voice on this issue, we now disapprove the standard of review language in [cases using the 'reasonable juror' standard], and reaffirm the standard set out in *Boyde*.

*Id.*; *see also Tyler v. Cain*, 533 U.S. 656, 658 n.1 (2001) ("In *Estelle* . . . this Court made clear that the proper inquiry is not whether the instruction 'could have' been applied unconstitutionally, but whether there is a reasonable likelihood that the jury *did* so apply it.").

Indeed, since deciding *Boyde* in 1990, the U.S. Supreme Court has repeatedly applied *Boyde*'s "reasonable likelihood" standard to jury instruction challenges. Recently, in *Kansas v. Carr*, 136 S. Ct. 633 (2016), the U.S. Supreme Court reiterated, "Ambiguity in . . . instructions gives rise to constitutional error only if 'there is a *reasonable likelihood* that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.' . . . A meager possibility of confusion is not enough." *Id.* at 642-43 (quoting *Boyde*, 494 U.S. at 380) (internal quotation marks omitted)); *see Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009) (quoting "reasonable likelihood" standard from *Boyde*); *Ayers v. Belmontes*, 549 U.S. 7, 12-13 (2006) (same); *Brown v. Payton*, 544 U.S. 133, 143-44 (2005) (same); *Middleton*, 541 U.S. at 437 (same); *Penry v. Johnson*, 532 U.S. 782, 800 (2001) (same); *Calderon*, 525 U.S. at 146-47 (same); *Estelle*, 502 U.S. at 72 (same); *see also Jones v. United States*, 527 U.S. 373, 391 (1999) (applying "reasonable likelihood" standard). Mills's assertion that a different standard applies to jury instructions involving presumptions is not supported by this precedent. To the contrary, the U.S. Supreme Court's explicit statement that *Boyde*'s "reasonable likelihood" standard is the "single standard of review of jury instructions" directly contradicts Mills's assertion. *See Estelle*, 502 U.S. at 72 n.4.

In the instant case, the California Supreme Court stated the legal standard that it applied to Mills's challenge as follows: "If the charge as a whole is ambiguous, the question is whether there is a 'reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.'" *Mills*, 286 P.3d at 763 (quoting *Middleton*, 541 U.S. at 437) (internal quotation marks omitted). The California Supreme Court thus identified the correct legal standard from *Middleton*, *Estelle*, and *Boyde* for reviewing Mills's challenge to the jury instructions.

Case No. 14-CV-00255-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Mills's challenge under the "contrary to" prong of 28 U.S.C. 2254(d)(1) therefore fails.

  **2.**  **The California Supreme Court's Decision Was Not an Unreasonable Application of Federal Law**

  To the extent that Mills raises a challenge under 28 U.S.C. 2254(d)(1)'s "unreasonable application" prong, that claim also fails. The Court assumes for the purposes of its analysis that the presumption-of-sanity instruction, if given effect by the jury, would have unconstitutionally lessened the prosecutor's burden of proof. Thus, the question is whether the California Supreme Court unreasonably applied clearly established federal law when it concluded that there was no reasonable likelihood that the jury would have applied the presumption-of-sanity instruction in an unconstitutional manner. The U.S. Supreme Court's decision in *Middleton*, which considered an erroneous imperfect self-defense instruction, is on point. The California Supreme Court reasonably applied *Middleton* in the instant case to conclude that even though the trial court erred by giving the presumption-of-sanity instruction during the guilt phase, there was "no reasonable likelihood that the jury gave effect to the conclusive [sanity] presumption." *Mills*, 286 P.3d at 764. The California Supreme Court looked to the same factors that the U.S. Supreme Court did in *Middleton*—the other jury instructions and counsel's arguments—and drew a reasonable conclusion from its analysis of those factors. *See Middleton*, 541 U.S. at 437-38; *Mills*, 286 P.3d at 763-64. The Ninth Circuit's decisions in *Patterson* and *Stark* do not compel a different result.

  As *Middleton* makes clear, the "reasonable likelihood" inquiry includes examining the challenged instruction in the context of the other jury instructions given by the trial court. *See Middleton*, 541 U.S. at 438 ("Given three correct instructions and one contrary one, the state court did not unreasonably apply federal law when it found that there was no reasonable likelihood the jury was misled."). In the guilt phase of the instant case, the trial court gave the jury at least 12 instructions related to mental health evidence, imperfect self-defense, and the mens rea requirements for murder and manslaughter, in addition to the one erroneous presumption-of-sanity instruction.[5] These guilt-phase instructions included the following, reproduced here in the order in

_____

[5] The fact that the California Supreme Court concluded that giving the presumption-of-sanity instruction during the guilt phase violated state law does not alone necessarily mean that a federal

Case No. 14-CV-00255-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

1  which the trial court gave them:

> You have received evidence regarding a mental disease or mental disorder of the defendant at the time of the commission of the crime charged in count one, namely murder, or a lesser crime thereto, namely voluntary manslaughter. You should consider this evidence solely for the purpose of determining whether the defendant actually formed the required specific intent, premeditated, deliberated or harbored malice aforethought, which is an element of the crime charged in count one, namely murder.
>
> ...
>
> The crime of manslaughter is the unlawful killing of a human being without malice aforethought. It is not divided into degrees but is of two kinds; namely, voluntary manslaughter and involuntary manslaughter.
>
> Every person who unlawfully kills another human being with an intent to kill or with conscious disregard for human life is guilty of voluntary manslaughter, a violation of Penal Code section 192, subdivision A.
>
> There is no malice aforethought if the killing occurred in the actual but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury.
>
> A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril or great bodily injury kills unlawfully but does not harbor malice aforethought is not guilty of murder. This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief. Such an actual but unreasonable belief is not a defense to the crime of voluntary manslaughter.
>
> As used in this instruction, an imminent peril or danger means one that is the apparent, present, immediate, and must be instantly dealt with or must so appear at the time to the slayer.
>
> For the purpose of reaching a verdict in the guilt phase of this trial, you are to conclusively presume that the defendant was legally sane at the time the offense[] [is] alleged to have occurred.
>
> In the guilt phase, any expert testifying about a defendant's mental disorder shall not testify as to whether the defendant had or did not have the required mental state. The question as to whether the defendant had or did not have the required mental state shall be decided by the trier of fact, which in this case is the jury.

constitutional error has occurred or that federal habeas relief should be granted. *See Gilmore v. Taylor*, 508 U.S. 333, 342 (1993); *Estelle*, 502 U.S. at 67.

A hallucination is a perception that has no objective reality.

If the evidence establishes that the perpetrator of an unlawful killing suffered from a hallucination which contributed as a cause of the homicide, you should consider that evidence solely on the issue of whether the perpetrator killed with or without deliberation and premeditation.

...

The defense of imperfect self-defense is not available to a defendant whose belief in the need to use self-defense is based on delusion alone.

The distinction between murder and manslaughter is that murder requires malice while manslaughter does not. When the act causing the death, though unlawful, is done in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, the offense is manslaughter. In that case, even if an intent to kill exists, the law is that malice, which is an essential element of murder, is absent.

To establish that a killing is murder and not manslaughter, the burden is on the people to prove beyond a reasonable doubt each of the elements of murder and that the act which caused the death was not done in the actual, even though unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury.

ECF No. 12-11 at 216-22.

As the California Supreme Court observed, none of the instructions on the mental health evidence, expert testimony, hallucinations, or delusions "would have made sense if the jury understood that [Mills] was conclusively presumed to be free of mental disease or disorder." *Mills*, 286 P.3d at 763-64. This conclusion is reinforced by the way the prosecutor and defense counsel tried the case.

Throughout the guilt phase of the trial, defense counsel consistently focused on Mills's paranoid personality style, delusions, and strange behavior. In his opening argument, defense counsel noted that "in the days and the weeks before Mr. Jackson-Andrade's tragic death, Mr. Mills became more and more afraid and his behavior became more and more bizarre." ECF No. 12-8 at 117. After recounting Mills's frantic, paranoid, and unusual behavior in the days before and day of the killing, defense counsel told the jury:

I expect that one of the things, that all of these things that have happened to Mr.

Mills might strike you as somewhat odd, perhaps even downright bizarre. Unless you think that Mr. Mills was whacked out on drugs when he shot Mr. Jackson-Andrade, he wasn't. . . .

Mr. Mills's bizarre behavior was not due to drugs. It was due to mental illness. Dr. Bruce Smith is a psychologist who has over three decades of experience and he is going to tell you that Mr. Mills [is] suffering from a paranoid delusional disorder. What that means in plain English is that Mr. Mills becomes afraid of things which have a basis in reality, but becomes afraid of those things wholly out of proportion to the amount of fear which the perceived threat would reasonably warrant. He observes things that are either very minor or completely benign and no threat to him at all and he misinterprets them as a grave threat directed specifically at him. And from that place of fear, he radically overreacts to any perceived threat which confronts him.

As you listen to the evidence in this case, ladies and gentlemen, I want you to ask yourself the question why, why did Mr. Mills shoot Mr. Jackson-Andrade? The evidence is going to show that Mr. Mills shot Mr. Jackson-Andrade because he was afraid for his life. There's no other reason.

ECF No. 12-8 at 121-22. In his cross-examination of the prosecutor's witnesses and direct examination of defense witnesses, defense counsel repeatedly drew attention to Mills's unusual behavior on the platform on the day of the killing as well as the evidence that he was experiencing paranoid delusions. *See* ECF No. 12-8 at 149, 152, 155; ECF No. 12-9 at 33, 94, 98; ECF No. 12-10 at 86, 238-60; ECF No. 12-11 at 31, 33.

In his closing argument, defense counsel again stressed that Mills's actions were driven by mental illness, including paranoia. *See* ECF No. 12-11 at 149 ("Mr. Mills shot Mr. Jackson because his judgment was clouded by mental illness."); *id.* at 162 (arguing that Mr. Mills's perception was influenced by "sleep deprivation and a paranoid hypervigilant psyche"). Indeed, defense counsel spent a significant portion of his closing argument summarizing the evidence of Mills's mental illness and explicitly tying that evidence to the assertion of imperfect self-defense:

[H]is paranoia and his hypervigilance and his persistent fears that people were trying to kill him and his tendency to overreact to those fears are critical to understanding how it is that Mr. Mills could have actually been afraid of Mr. Jackson under these circumstances. It's critical.

Now, in addition to Dr. Smith's testimony and his opinion, you have all the various witness accounts, friends and strangers alike, who described Mr. Mills's conduct at the time of the offense. . . . Dancing, singing, talking to himself. Extreme mood [s]wings and some very frank proclamations that he was acting

like a crazy man.  And as I said at the beginning of this case that behavior was not caused by drugs. . . .

And though Mr. Mills was not under the influence of drugs, he did know, he did recognize that there was something not right about the way that his mind was working. . . .  Just because Mr. Mills is sitting there and he's not covered in dirt and pushing a shopping cart and talking to himself doesn't mean that he does not have a mental illness.  He's paranoid.  He's not schizophrenic. . . .

And if an expert's opinion and the various accounts of Mr. Mills's words and conduct were not enough to demonstrate to you that he has a mental illness, he waived his constitutional right not to testify and he got on that stand and he described to you in detail his mental processes.  What did you think of those mental processes? . . .

…

Taken together, all of the evidence that I have presented to you then and now is that Mr. Mills in fact suffers from a serious mental illness.  And that is the world view that he brought with him to the train station on that day.  He brought with him to the train station that day all of the fears of all of the things that had happened to him up to that point. . . .

. . . He arrived at that train station, sleep deprived, disorganized and gripped by the fear that all of these people were trying to kill him and they were getting closer.  That's what he brought to his encounter with Mr. Jackson.  And though from his perspective, Mr. Jackson may well have been simply attempting to make friendly conversation, Mr. Mills interpreted his otherwise benign inquiry about where he was from or what was up with him as a proclamation of gang affiliation.  And Mr. Mills's wheels start[ed] spinning, round and round about all the people who are trying to kill him and how Mr. Jackson must have been one of them.  Why else would this strange man be talking to me?  And Mr. Mills responded with anger and with harsh words to that otherwise benign inquiry.  No doubt causing Mr. Jackson to become afraid.

And why would Mr. Jackson make any threats against Mr. Mills if in fact Mr. Jackson was unarmed as we know he was? . . .  Maybe he was trying to get Mr. Mills to back down.  Maybe he thought to himself, if I say certain things to this guy maybe he's going to back off and go away, which no doubt he wanted him to do.

But from Mr. Mills's perspective, that did nothing but confirm the suspicions that he already had.  Isn't that exactly the type of disorder that Dr. Smith testified about[?]  Benign on its face but misinterpreted by Mr. Mills as confirming a threat directed specifically at him.  However unreasonable it appears to us as rational, clear thinking people, Mr. Mills told you in no uncertain terms that he believed Mr. Jackson was reaching for a gun when he shot him, even when he was trying

to get up off the ground.

…

You're going to receive a series of instructions about mental disease or mental illness, including the following: You should consider this evidence solely for the purpose of determining whether the defendant actually harbored malice aforethought, and additionally, there is no malice aforethought if the killing occurred in the actual but unreasonable belief and the necessity to defend. In other words, you could consider evidence as mental illness as to whether or not Mr. Mills was actually afraid. And at the same time, however, his fear cannot be solely the product of a delusion. That is, it cannot derive from a delusion alone and still be manslaughter. [But] we know that his fears were not solely the product of a delusion. How do we know that? We know that the delusion and the paranoia colored his fear, no doubt, but they didn't create them. All of his fears had a basis in reality. He just blew them completely out of proportion.

ECF No. 12-11 at 167-73.

Relatedly, the prosecutor did not rely on the presumption of sanity in trying the guilt phase of the case. The prosecutor referenced the presumption of sanity only once, relating it to the bifurcated proceedings. ECF No. 12-11 at 104. Otherwise, the prosecutor directly challenged the defense's unreasonable self-defense theory on the merits by arguing that Mills had the mens rea required for murder and was fabricating his claimed mental illness. *See, e.g.*, ECF No. 12-8 at 106, 109-12; ECF No. 12-11 at 110, 112, 116, 118, 120. The prosecutor argued in the alternative that any fear Mills did have had no basis in reality because witness testimony established that Jackson-Andrade never threatened Mills and Mills knew that Jackson-Andrade did not have a weapon. ECF No. 12-11 at 112, 115, 134. The prosecutor also argued that Mills's actions at the time of his arrest contradicted his claim that he was genuinely afraid of Jackson-Andrade because Mills did not tell the police that he was afraid of Jackson-Andrade, that Jackson-Andrade had a gun, or that he shot in self-defense. *Id.* at 117-18.

Finally, the prosecutor stressed that it was the jury's responsibility to determine Mills's mental state at the time of the killing, not the psychology expert witness's. The prosecutor told the jury:

Now, let me just say I think psychiatric help for individuals is a good thing. . . .

What I don't think is a good thing is when there's a hired gun that comes in here

24

to court and tries to use this aura of scientific reliability to try and tell you what was in somebody's mind four years before. . . .

And most importantly, it's not his job. It's your job. The law is that you get to decide the mental state. Any expert testifying about a defendant's mental disorder shall not testify as to whether the defendant had or did not have the required mental state. The question as to whether the defendant had or did not have the required mental state shall be decided by the jury. You decide. He doesn't get to decide.

Taken together, the way the prosecutor and defense counsel tried the case, including the way that they characterized the mental health evidence and the jury instructions, support the California Supreme Court's conclusion that there was no reasonable likelihood that the jury would have interpreted the presumption-of-sanity instruction as precluding it from considering the mental health evidence. *See Middleton*, 541 U.S. at 438 ("Nothing in *Boyde* precludes a state court from assuming that counsel's arguments clarified an ambiguous jury charge."); *Randell v. Spearman*, 585 F. App'x 456, 457 (9th Cir. 2014) (unpublished) (considering arguments of parties in evaluating likely effect of erroneous jury instructions). Indeed, the instant case seems to be precisely the type of situation that the U.S. Supreme Court envisioned in *Boyde*, where "[d]ifferences among [the jury] in interpretation may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting." *Boyde*, 494 U.S. at 380-81.

Mills relies heavily on the Ninth Circuit's decisions in *Patterson* and *Stark* to argue that the California Supreme Court unreasonably applied federal law, Pet. 29-30, 37-45, but these cases do not compel a different result than that reached by the California Supreme Court. As discussed above, "circuit precedent does not constitute clearly established Federal law" for the purposes of 28 U.S.C. § 2254(d)(1). *Glebe v. Frost*, 135 S. Ct. 429, 431 (2014) (per curiam) (internal quotation marks omitted). A district court may only "look to circuit precedent to ascertain whether [the circuit] has already held that the particular point in issue is clearly established by Supreme Court precedent." *Marshall*, 133 S. Ct. at 1450. The Court concludes that *Patterson* and *Stark* are distinguishable for at least three reasons and thus do not support a conclusion that the California Supreme Court unreasonably applied federal law.

25

First, *Patterson* and *Stark* are distinguishable because they applied the "reasonable juror" standard from *Sandstrom* and *Francis* rather than the "reasonable likelihood" standard from *Boyde* and *Estelle*. In *Patterson*, for example, the Ninth Circuit recited the "reasonable likelihood" standard but also consistently referenced how a reasonable juror could perceive the jury instructions at issue in that case. *See* 223 F.3d at 962 (providing "reasonable likelihood" standard); *id.* at 965 ("Whether the jury was required to presume the non-existence of a mental disease, defect, or disorder depends on the definition of sanity that a reasonable juror could have had in mind."); *id.* at 966 ("[A] reasonable juror could well conclude that he or she must presume that the defendant had no such mental disease, defect, or disorder."). *Stark* did not mention the "reasonable likelihood" standard at all, instead only relying on the "reasonable juror" standard. *See* 455 F.3d at 1077-80 ("Given the charge, a reasonable juror could have concluded that he or she was required to determine only whether petitioner was able to form the requisite intent if he was sane at the time . . . ."). *Stark* reaffirmed *Patterson*, but did not mention the U.S. Supreme Court's decisions in *Brown*, 544 U.S. 133, or *Middleton*, 541 U.S. at 437, both of which were decided after *Patterson* and both of which applied the "reasonable likelihood" standard to jury instruction challenges. The application of a standard rejected by the U.S. Supreme Court in *Estelle* and *Boyde* is a legitimate ground for distinguishing *Patterson* and *Stark*. However, the Court notes that its conclusion that the California Supreme Court reasonably distinguished *Patterson* and *Stark* would be the same even assuming that each case applied the *Estelle* and *Boyde* standard.

Second, as the California Supreme Court recognized, *Patterson* and *Stark* are distinguishable from the instant case because the defenses at issue differed. The Ninth Circuit in *Patterson* and *Stark* held that a defendant's due process rights are violated where the defendant argues that mental illness prevented him or her from forming the specific intent to commit a crime such as murder and the jury is instructed to presume the defendant sane. *Stark*, 455 F.3d at 1078; *Patterson*, 223 F.3d at 966. In the instant case, Mills did not argue that he lacked the specific intent for murder. "He admitted that he intentionally shot the victim, and did not dispute the intent

26

to kill." *Mills*, 286 P.3d at 763. The California Supreme Court held that Mills's unreasonable self-defense argument "was narrower and less directly related to considerations of sanity, in the lay sense, than were the defenses in *Patterson* and *Stark*." *Id.* Moreover, the California Supreme Court held that "[p]resumed sanity is consistent with unreasonable self-defense." *Id.* These conclusions are not obviously erroneous, let alone objectively unreasonable. *See Middleton*, 541 U.S. at 437.

Finally, differences in how the cases were tried provide further bases for distinguishing the instant case from *Patterson*. In *Patterson*, for example, the trial court instructed the jury to presume that the defendant was sane; "nowhere did [it] warn the jury that 'sane' was being used in something other than the conventional lay sense that the jurors were likely to have had in mind." 223 F.3d at 966. By contrast, in the instant case the trial court's instruction used the phrase "legally sane," ECF 12-5 at 95; ECF 12-11 at 221, which suggests that the word "sane" was *not* being used in "the conventional lay sense." In addition, the prosecutor in *Patterson* "repeatedly relied on the presumption [of sanity] to tell the jury that petitioner's evidence was legally irrelevant and must be disregarded." 223 F.3d at 967. In the instant case, the prosecutor attacked the reliability of Mills's mental health evidence, rather than relying on the presumption of sanity. These differences show that the California Supreme Court was not objectively unreasonable in reaching a different conclusion about the likely effect of the presumption-of-sanity instruction on the jury's verdict in the instant case than the Ninth Circuit did in *Patterson*.

## IV.   CONCLUSION

For the foregoing reasons, the Petition for Writ of Habeas Corpus is DENIED. A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability. *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: the petitioner must demonstrate that reasonable jurists would find the district

27

court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Having considered the submissions of the parties, the relevant law, and the record in this case, the Court finds that jurists of reason would find the result in the instant case debatable. Accordingly, the Court issues a certificate of appealability for Mills's challenge to the presumption-of-sanity jury instruction.

**IT IS SO ORDERED.**

Dated: September 29, 2017

_Lucy H. Koh_

LUCY H. KOH
United States District Judge

United States District Court
Northern District of California